# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) <br>                   ) <br>        Plaintiff,        ) <br>                   ) <br> v.                       ) <br>                   ) <br> REAL PROPERTY LOCATED AT   ) <br> 132 FERRO STREET, PIKEVILLE,   ) <br> TENNESSEE 37367,          ) <br>                   ) <br>        Defendant.      ) | **Case No: 1:19-CV-** <br><br> **Judges** |

## VERIFIED COMPLAINT *IN REM*

Comes now the plaintiff, United States of America, by and through its attorneys, J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, and Gretchen Mohr, Assistant United States Attorney, and brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## NATURE OF THE ACTION

1. In this *in rem* civil action, the United States of America seeks forfeiture of the real property having a mailing address of 132 Ferro Street, Pikeville, Tennessee 37367[1] (hereinafter "defendant property").

---

[1] The City of Pikeville identifies this property as 90 Ferro Street; however, other records obtained during the course of the investigation sometimes refer to the property as 132 Ferro Street or 132 Ferro Road.

## THE DEFENDANT *IN REM*

2. The United States seeks forfeiture of the following defendant property, with all appurtenances, improvements, and attachments thereon, which is more fully identified and more particularly described below:

> To find the true point of beginning, begin at the intersection of the Westerly line of Bledsoe Recreation Center property with the Southern right of way line of Cleveland Street and go, thence South 44°23'17" West and along the Westerly line of Bledsoe Recreation Center property a distance of 755.08 feet to a point; thence South 49°10'55" East along the Southerly line of the Bledsoe Recreation Center property a distance of 778.65 feet to fence corner, said corner also being the Southeast corner of the Bledsoe Recreation Center; thence South 49°4'21" East a distance of 587.73 feet to a point in the Western right of way line of "C" Street; thence South 49°10'39" West along the Western right-of-way line of "C" Street a distance of 156.75 feet to a point; thence North 48°34'21" West and leaving said right of way line a distance of 33.0 feet to a point; thence South 44°9'20" West a distance of 213.66 feet to a wood fence post; thence North 37°17'7" West a distance of 156.96 feet to a fence post; thence South 49°45'17" West a distance of 235.90 feet to a wood fence post; thence 46°53'59" West a distance of 235.90 feet to a wood fence post; thence 46°53'59" West a distance of 1,177.97 feet to a point; thence North 48°20'49" East a distance of 527.47 feet to the Point of Beginning.
>
> Being the same property conveyed to the Grantor by deed of record in Book RB 304, Page 108, Register's Office, Bledsoe County, Tennessee.
>
> For further reference see Warranty Deed filed and recorded on July 7, 2017, in Deed Book RB 313, Pages 443-448, in the Register of Deed's Office of Bledsoe County, Tennessee, Instrument Number 17115404.

3. The defendant property has not been seized but is within the jurisdiction of the Court pursuant to 28 U.S.C. § 1355(b)(1)(A). The United States does not request authority from the Court to seize the defendant property at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(2) and (c)(1):

> a. post notice of this action and a copy of the Complaint on the defendant property;

2

b.      serve notice of this action on the record owners of the defendant property, and any other person or entity who may claim an interest in the defendant property, along with a copy of this Complaint;

c.      execute a writ of entry for purposes of conducting an inspection and inventory of the defendant property; and

d.      file a notice of *lis pendens* in the county records where the defendant property is located.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.      This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture of the defendant property occurred in this district.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district.

## BASIS FOR FORFEITURE

7.      The United States of America seeks forfeiture of the defendant property pursuant to the following:

a)    18 U.S.C. § 981(a)(1)(A), which authorizes forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation 18 U.S.C. § 1957, or any property traceable to such property;

b)    18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 and/or 1957; and

c)    18 U.S.C. § 981(a)(1)(c) by 18 U.S.C. § 1956(7)(F), which authorizes forfeiture of any property, real or personal, which constitutes proceeds traceable to violations of 18 U.S.C. § 371.

3

8.      Pursuant to 18 U.S.C. § 981(f), all right, title and interest in the defendant property became vested in the United States at the time of the acts giving rise to the forfeiture.

## FACTS

9.      As set forth in detail in the Affidavit of Special Agent, David Kukura, Federal Bureau of Investigation, the Government's investigation has determined that defendant property constitutes proceeds of an offense in violation of federal law including wire fraud and money laundering.  Furthermore, your Affiant has probable cause to believe the defendant property constitutes proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1957 (Money Laundering) and is subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and constitutes proceeds traceable to violations of 18 U.S.C. § 371 (Conspiracy to Commit an Offense or to Defraud United States) and is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) by 18 U.S.C. § 1956(7)(F).

10.      The defendant property is subject to forfeiture to the United States in accordance with 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(c), and 18 U.S.C. § 1956(7)(F).

## CLAIM FOR RELIEF

11.      Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 10 above.

4

## **PRAYER FOR RELIEF**

Wherefore, the United States of America prays:

1.     Defendant property be condemned and forfeited to the United States of America in accordance with the provisions of law;

2.     Notice of this action be given to all persons known or thought to have an interest in or right against the defendant property;

3.     Plaintiff be awarded its costs in this action and for such other necessary and equitable relief as this Court deems proper.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney


By:     *s/Gretchen Mohr*
        GRETCHEN MOHR
        Assistant United States Attorney
        800 Market Street, Suite 211
        Knoxville, Tennessee  37902
        (865) 545-4167

## **VERIFICATION**

I, David Kukura, Special Agent, Federal Bureau of Investigation, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746, the following:

That I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint *In Rem* and in the accompanying Affidavit are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are from information gathered by law enforcement officers, as well as my investigation of this case with the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this _5th_ day of June, 2019.

_____
David Kukura
Special Agent
Federal Bureau of Investigation

6

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

132 Ferro Road, Pikeville, Tennessee 37367

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Bledsoe County, TN
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gretchen Mohr, AUSA, 800 Market St., Suite 211
Knoxville, Tennessee 37902, (865) 545-4167

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
     Plaintiff

☐ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 2   U.S. Government
     Defendant

☐ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | ☒ 690 Other |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| |    Medical Malpractice | |    Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |    Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    Agency Decision |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |    State Statutes |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
     Proceeding

☐ 2   Removed from
     State Court

☐ 3   Remanded from
     Appellate Court

☐ 4   Reinstated or
     Reopened

☐ 5   Transferred from
     Another District
     *(specify)*

☐ 6   Multidistrict
     Litigation -
     Transfer

☐ 8   Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C) and 1956(7)(F)

Brief description of cause:
Forfeiture of real property derived from proceeds traceable to 18 U.S.C. §§ 371, 1343 and 1957

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Harry S. Mattice, Jr.

1:19-CV-61
DOCKET NUMBER 1:19-CV-64

DATE   06/05/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ Gretchen Mohr

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT *IN REM*

I, David Kukura, being first duly sworn, states that the following is true and correct to the best of my knowledge:

### Professional Training and Experience of Affiant

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for over 29 years. I am a Certified Public Accountant, and prior to joining the FBI, I worked for a public accounting firm. As a Special Agent, my duties and responsibilities have included conducting criminal investigations of individuals and business entities for possible violations of federal laws, particularly those laws found in Title 18, United States Code. From November 1989 to June 2015, I was assigned to the FBI's Minneapolis, Minnesota, office, during which time I was assigned to a White Collar Crime squad with responsibility for investigating violations such as Mail Fraud, Fraud By Wire, Bank Fraud, and Money Laundering, including investigations which resulted in the seizure and forfeiture of money and property which were the proceeds of unlawful activity. Since early July 2015, I have been assigned to the FBI's Chattanooga, Tennessee, office where I have been assigned to work primarily on White Collar Crime investigations.

2.      I have experience in the execution of financial documentary search warrants, the debriefing of defendants, witnesses, informants and other persons who have knowledge of the amassing, spending, converting, transporting, distributing, laundering and concealing the proceeds of illegal activities.  In connection with my official duties as a Federal Law Enforcement Officer, I have been assigned or assisted with investigations involving tax fraud,

mail fraud, wire fraud, bank fraud, money laundering and other financial fraud in violation of Titles 18, 26 and 31 of the United States Code. Many of the investigations in which I have participated have resulted in the arrest, prosecution and conviction of individuals who have committed these crimes.

3.    The following information is based on my own personal observations and knowledge, as well as information provided by Agents/Investigators from the Department of Homeland Security – Office of Inspector General (DHS-OIG), the Tennessee Valley Authority – Office of Inspector general (TVA-OIG), the Tennessee Bureau of Investigation (TBI), and the Tennessee Comptroller of the Treasury (TCOT); interviews conducted with the Sadruddins and other witnesses; and from documents and sources noted herein. This affidavit does not contain all of the information known to law enforcement regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the Verified Complaint *In Rem* and does not set forth all of my knowledge about this matter.

## Probable Cause

4.    Based on my training, experience, and background as a Special Agent for the FBI and the facts set forth below, I have probable cause to believe that Karim Sadruddin and his brother Rahim Sadruddin, a.k.a. Rahim Ali (hereinafter referred together as "the Sadruddins"), have committed violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1957 (Money Laundering), and 18 U.S.C. § 371 (Conspiracy to Commit an Offense or to Defraud United States). In particular, there is reasonable cause to believe that the Sadruddins have perpetrated grant fraud against a department of the State of Tennessee.

Page **2** of **15**

5.    In or about June 2017, acting through one of their corporations called Textile

Corporation of America LLC (TCA), the Sadruddins obtained a $3 million economic

development grant from the State of Tennessee's Department of Economic and Community

Development (ECD) to purchase and retrofit/renovate a proposed textile manufacturing facility

in Pikeville, Tennessee. In order to gain the state grant funds, the Sadruddins submitted

fraudulent and misleading documents and records, including, but not limited to, an application, a

letter explaining TCA's alleged relationship to a textile manufacturing company located in

Pakistan, and a financial statement of that Pakistani textile company.

### Real Property for Forfeiture

6.    This affidavit supports the civil forfeiture of real property, with all appurtenances,

improvements, and attachments thereon, located at 132 Ferro Street[1], Pikeville, TN 37367,

Bledsoe County Tax Parcel Number 064-39.00, Pikeville, Tennessee, and described as follows:

> To find the true point of beginning, begin at the intersection of the Westerly
> line of Bledsoe Recreation Center property with the Southern right of way
> line of Cleveland Street and go, thence South 44°23'17" West and along the
> Westerly line of Bledsoe Recreation Center property a distance of 755.08
> feet to a point; thence South 49°10'55" East along the Southerly line of the
> Bledsoe Recreation Center property a distance of 778.65 feet to fence
> corner, said corner also being the Southeast corner of the Bledsoe Recreation
> Center; thence South 49°4'21" East a distance of 587.73 feet to a point in
> the Western right of way line of "C" Street; thence South 49°10'39" West
> along the Western right-of-way line of "C" Street a distance of 156.75 feet
> to a point; thence North 48°34'21" West and leaving said right of way line
> a distance of 33.0 feet to a point; thence South 44°9'20" West a distance of
> 213.66 feet to a wood fence post; thence North 37°17'7" West a distance of
> 156.96 feet to a fence post; thence South 49°45'17" West a distance of
> 235.90 feet to a wood fence post; thence 46°53'59" West a distance of
> 235.90 feet to a wood fence post; thence 46°53'59" West a distance of

---

[1] The City of Pikeville identifies this property as 90 Ferro Street; however, other records obtained during the course of the investigation sometimes refer to the property as 132 Ferro Street or 132 Ferro Road.

1,177.97 feet to a point; thence North 48°20'49" East a distance of 527.47 feet to the Point of Beginning.

Being the same property conveyed to the Grantor by deed of record in Book RB304, Page 108, Register's Office, Bledsoe County, Tennessee.

For further reference see Warranty Deed filed and recorded on July 7, 2017, in Deed Book RB313, Page 443-448, in the Register of Dee's Office of Bledsoe County, Tennessee, Instrument Number 17115404.

(hereinafter "defendant property").

7.     Based on the information developed throughout this investigation and set out in this affidavit, I believe the defendant property constitutes proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1957 (Money Laundering) and is subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and constitutes proceeds traceable to violations of 18 U.S.C. § 371 (Conspiracy to Commit an Offense or to Defraud United States) and is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) by 18 U.S.C. § 1956(7)(F).

### Background of Investigation

8.     Beginning in or about April 2017 and continuing until in or about November 2017, the Sadruddins, operating as TCA, engaged in a conspiracy to defraud the State of Tennessee by submitting false and misleading documents and information in the grant application process. A business bank account for TCA was maintained at Regions Bank.

9.     The FBI, TBI, and TCOT have been investigating a fraud involving a grant issued by the State of Tennessee's Department of Economic and Community Development (ECD) to TCA. The Tennessee grant fraud investigation began in June 2018, based on information that the Sadruddins had perpetrated a fraud involving a $3 million grant from ECD for the purchase and

renovation of a building in Pikeville, Tennessee, which was to be used as a textile manufacturing plant. It was alleged that the Sadruddins hired Edgar Cagle d.b.a. Cagle Development (an entity not owned or operated by the Sadruddins) to do the renovation work on the building; and Karim Sadruddin, acting on behalf of TCA, submitted a fictitious Cagle Development invoice and a fictitious Regions Bank wire transfer record to the State in order to fraudulently obtain a $1,406,000 reimbursement check from the grant funds for renovation work allegedly completed on the building. The investigation has subsequently confirmed that the invoice and wire transfer record were, in fact, fictitious; but the investigation also determined that the Sadruddins provided false information to ECD during the grant application process in order to qualify for the grant.

10. Based on interviews with the Sadruddins and other witnesses, I have learned the Sadruddins proposed establishing a textile plant in Pikeville, Tennessee, and claimed that the operation would employ approximately 1,000 people. In or about April 2017, representatives of ECD explained to the Sadruddins what incentives, including grants, could be available for the project. ECD representatives further communicated to the Sadruddins permissible and impermissible uses of the grant funds and that the grants were "reimbursable." They also explained how the funds flowed for the grant process, that is, ECD's grant funds flow through the local community's Industrial Development Board (IDB) to the company (in this case TCA) as a reimbursement of eligible expenses, such as purchasing the building or for improvements to the building. ECD representatives told the Sadruddins that the company would have to submit an invoice and proof of payment for an eligible expense to the IDB which would send these records to ECD, and then ECD would send money to the IDB which would then reimburse the company.

11.    On May 9, 2017, Karim Sadurddin, acting on behalf of TCA, submitted a "Tennessee Application for Incentives" which ECD utilizes in determining eligibility for various state economic development incentives and programs. TCA's application indicated that TCA was applying for a Fast Track Job Training Assistance Program and a Fast Track Economic Development Grant for a proposed textile production facility in Pikeville, Tennessee, which would employ almost 1,000 people producing "Made In America" linen products. The application was submitted by "Karim Sadruddin, Manager", and in the application, Karim Sadruddin represented that TCA's parent company was Al Rahim Textile Industry (ARTI) whose global headquarters is in Karachi, Pakistan. The application identified Karim Sadruddin as C.O.O., Rahim Ali (a.k.a. Rahim Sadruddin) as the "HR Contact", and Faisal Saya as C.E.O. The application also represented that the applicant, TCA, would commit to providing over $27 million in financing for the project. I have interviewed ECD employees who were involved in TCA's grant application process, including ECD's Regional Director for the southeast region. To receive the ECD grant funds, TCA made job and capital investment commitments. Because the Sadruddins were making a $27 million capital commitment themselves, and not borrowing the funds from a bank, ECD wanted financial information to prove that the Sadruddins had the wherewithal to make that kind of capital investment. TCA's application indicated that TCA's parent company was ARTI. The Regional Director asked for the parent company's financial statement. The Regional Director relied on the information provided by the Sadruddins in the application and the financial statement to be truthful and accurate, and relied on what was provided to show that the Sadruddins had money for their capital investment.

12.     As part of the ECD grant application, an ARTI financial statement and a letter on

ARTI letterhead dated May 17, 2017, with the apparent signature of Karim Sadruddin, were

submitted. In the May 17, 2017, letter, Karim Sadruddin stated "this letter is written to explain

the relationship of Textile Corporation of America, (TCA) and Al Rahim Textile. TCA will be a

TN registered corporation under its parent corporation, Al Rahim Textile, Industries".

13.     In June 2017, ECD offered a $3 million Fast Track grant incentive package to the

Bledsoe County Industrial Development Board (IDB), which in turn would disburse the grant

funds to TCA. The $3 million grant was to be used for the purchase and renovation/retrofit of the

building located in the city of Pikeville, Bledsoe County, Tennessee, which TCA would use as its

textile manufacturing facility. $850,000 was to be used for the purchase of the building, and any

remaining funds were to be used for the renovation of the building. The IDB engaged the services

of the Southeast Tennessee Development (SETD) to assist in administering the grant. Grant funds

were not advanced to TCA for the purchase and renovation of the building. Instead, TCA had to

buy the building with its own funds, or pay for an approved expense associated with the

renovation of the building, and then submit a claim for reimbursement by providing an invoice

and proof of payment. TCA engaged the services of Cagle Development to assist with the initial

purchase and subsequent renovation work on the building.

14.     During the course of this investigation, I obtained the Operating Agreement and

the membership Contribution Agreement for TCA. These agreements show that TCA was formed

as a Tennessee limited liability company (LLC), and the agreements were entered into on July 1,

2017, with Karim Sadruddin and Edgar Cagle as the sole members, each having a 50 percent

interest in the LLC. The Contribution Agreement states that consideration for Karim Sadruddin's

50 percent membership interest in TCA is "Monetary", and that "Karim Sadruddin, as part of his contribution to capital, shall make the necessary capital contributions for machinery and operating assets of the Company, including without limitation those required by the agreement between the Company and the Department of Economic and Community Development of the State of Tennessee as a condition of receiving a grant from the State of Tennessee for economic development in Bledsoe County, Tennessee." During the course of this investigation, TCOT investigators obtained TCA's grant application records from ECD. One of those investigators and I have both reviewed the records provided by ECD, and we are unable to find the TCA Operating Agreement or Contribution Agreement in the ECD records. Therefore, it does not appear that ECD was ever provided these agreements about TCA's corporate structure which would have revealed that Karim Sadruddin and Cagle were the only members of TCA, and that Karim Sadruddin was responsible for capital contributions. Instead, it appears that ECD continued to operate under the mistaken impression that TCA's parent company was ARTI, and that ECD continued to rely on the ARTI financial statement as the source of TCA's capital investment. As of July 1, 2017, ECD had not yet released any grant funds.

15. On or about July 7, 2017, Karim Sadruddin and Edgar Cagle, as managing members of TCA, signed an $850,000 promissory note to borrow funds from Cagle's brother (initials "C.F.C."). These funds were used to purchase the Pikeville building that day from the IDB. As stated above, Karim Sadruddin represented in TCA's grant application that TCA would be providing its own $27 million in project financing. However, TCA actually borrowed the funds from "C.F.C." to purchase the building, in spite of Karim Sadruddin's representation in the grant application that no financing for the project would come from Financial Institution(s), Local

Government(s), the Federal Government, or "Other" sources. The Sadruddins were interviewed by TCOT investigators on January 8, 2019. During this interview, the Sadruddins acknowledged borrowing the $850,000 from "C.F.C." for the building, and agreeing to pay "C.F.C." a $100,000 fee for the opportunity cost of doing the deal. Thus, the Sadruddins agreed to pay "C.F.C." a total of $950,000. The Sadruddins claimed that they agreed to this amount because it was cheaper than getting the money from Pakistan.

16.     On August 1, 2017, Rahim Sadruddin called the Director of SETD and asked what a Fast Track contract and request for reimbursement looked like, and in response, the Director emailed an example of a contract and request for reimbursement. The Director sent the email to both Karim and Rahim Sadruddin. On August 25, 2017, Rahim sent an email to the Director of SETD asking to schedule a phone call to discuss how TCA was currently making payments to their general contractor and to be sure that exact records were being kept to turn in for reimbursement. I have interviewed the Director of SETD who informed me that during a subsequent telephone conversation with the Sadruddins, she referred them to the August 1, 2017 example which she had emailed to them and explained that they had to submit invoices and proof of payment in order to be reimbursed.

17.     On October 3, 2017, Karim Sadruddin sent an email to a representative of SETD, the mayor of Bledsoe County, and Rahim Sadruddin, to which Karim Sadruddin attached a schedule which reflected the real estate purchase cost of $850,000 for the Pikeville building, and represented that $1,406,900 of work had been completed on the building. Also attached to Karim Sadruddin's email were an alleged Cagle Development invoice dated August 26, 2017, in the amount of $1,406,900, and a purported wire transfer record reflecting a transfer of $1,406,900 on

Page **9** of **15**

September 14, 2017, from TCA's account at Regions Bank ending in -7570[2] to Cagle

Development's account at SunTrust Bank. The investigation has determined that the alleged

Cagle Development invoice is fraudulent and was not issued by Cagle Development. The

purported wire transfer record appears to be an email from Regions Bank to Karim Sadruddin

with the subject "Outgoing Funds Transfer Debit Information TRN 170914-008066.[3]" In his

October 3, 2017, email, Karim Sadruddin references the alleged invoice and wire transfer record

by stating, in part, "Please see attached invoice and backup for the 1st draw request... Please let

us know when the funds will be released, we have a finance meeting this week and I would like

to update everyone on where we stand".

18.     On November 8, 2017, the IDB issued two checks to TCA in the amounts of

$850,000 and $1,406,900. The $850,000 check was to reimburse TCA for the purchase of the

building, and the $1,406,900 check was for reimbursement of expenses associated with the

renovation of the building. I have interviewed the Mayor of Bledsoe County who informed me

that he called Karim Sadruddin to inform him that the checks were ready, and Karim Sadruddin

then drove from Atlanta to Pikeville, Tennessee, to collect the checks.

19.     On November 9, 2017, the checks, totaling $2,256,900, were deposited to TCA's

bank account ending in -1663 at the Regions Bank branch in Suwanee, Georgia. The account

balance at the time of deposit was $500.

---

[2] Account -7570 is actually associated the MGUSA's Regions Bank account, and is believed to be a typo associated with this fraudulent document.

[3] Regions Bank has since advised a DHS-OIG agent that this email confirmation is fraudulent and that Regions Bank records do not show that a wire for the aforementioned amount was processed

20.     On November 15, 2017, two wire transfers in the amounts of $143,900 and $806,100 (totaling $950,000) were sent from TCA's Regions Bank account -1663 to Cagle Development's SunTrust Bank account. These wire transfer records falsely described the $143,900 payment as "Development Cost, Final Payment", and the $806,100 payment as "Balance for remodel Pikeville". However, these wire transfers were actually for the repayment of the $850,000 loan and the $100,000 fee (totaling $950,000) due to Cagle's brother, "C.F.C."

21.     On March 27, 2019, I participated in interviews of the Sadruddins, who were interviewed in the presence of their attorneys. At the beginning of the interviews, the Sadruddins were advised that their participation in the interview was voluntary and that the government could use their statements against them. During the course of the interviews, the Sadruddins admitted that there were fraudulent representations in the "Tennessee Application for Incentives" submitted to ECD.

a)     Rahim Sadruddin advised that he was not involved in the negotiation of the incentive package, but Karim explained the incentive package to Rahim, so Rahim knew what the incentives were. Rahim was aware of the content of the grant application and the incentive package offered by the State, which was $3 million to pay for the building and retrofitting, which your affiant understood to mean the same as making improvements and/or renovations to the building, which were approved uses of grant funds. Rahim admitted that neither he nor his family had access to nor means to obtain the $27.1 million facility investment set forth in the application. Rahim understood that the 27.1 million set forth in the application was a financial impossibility and fraudulent. Rahim also admitted that while Karim did have conversations with Faisal Saya and anther individual at ARTI, who were interested in getting into manufacturing in the United

States, there was never an agreement between the Sadruddins' company and ARTI. Further, the claim that ARTI was the parent company of TCA was completely false. Rahim admitted that he continued to assist as the process moved along knowing it was fraudulent. ARTI did not authorize Karim to use its information or letterhead. Rahim also admitted that he and Karim were not going to hire 1,000 employees, and that representing that fact was a fraudulent and deceptive statement. Rahim admitted that 1,000 employees would have been a major undertaking, requiring a large cash-flow and at least two years of reserves. The Sadruddins had no means to obtain that capital. Ultimately, Rahim understood that there was no way the Sadruddins would get the grant without the misrepresentations and frauds;

b) Karim Sadruddin admitted that there were multiple lies in the documents which he submitted to the State of Tennessee, including the following: Karim admitted that the $27 million investment was a lie. Karim admitted he did not have an agreement with ARTI to provide the Sadruddins with financial backing, and the representation of $27 million which Karim made on the form to obtain the grant from the State of Tennessee was fraudulent. Karim advised that he was asked for a letter saying that TCA was going to be an affiliate of ARTI, and he admitted that he created a false letter (referenced in paragraph 12 above). Karim admitted that the company structure with Faisal Saya and Karim on the grant application, the country of global headquarters in Karachi, Pakistan, and the name of parent company ARTI were all lies. Regarding the "New Job Creation and Investment Schedule" section in the grant application, Karim admitted that the investment schedule of $27 million was a lie, and that the job numbers were also a lie because it required financial cash to back it up which Karim did not have. Karim admitted that some of the grant money was used for inventory, which he knew was not allowed. He further

admitted that he omitted the fact that he intended to use some of the grant money for inventory on the grant application.

22.     I spoke to Faisal Saya by telephone who advised as follows:  Saya and his brother and father operate multiple businesses, including ARTI. They manufacture textiles at mills located in Pakistan, and supply the textiles across the world. Saya is familiar with the Sadruddins and their father, Mansoor. The Sadruddins have no ownership in ARTI. Karim Sadruddin fabricated ARTI's letterhead on the letter dated May 17, 2017, (referenced in paragraphs 12 and 21(b) above), which states that ARTI is the parent company of the Sadruddins' company called TCA. Karim Sadruddin's signature is on the document, but Karim Sadruddin has nothing to do with Saya's family's company. To Saya's knowledge, the Sadruddins do not own any textile plants of their own. The Sadruddins are former customers, and Saya's family supplied the Sadruddins with sheets and fabric, but broke the relationship with the Sadruddins because the Sadruddins did not pay their bill. Saya is aware that the Sadruddins were going to open a manufacturing plant in the United States, and Karim Sadruddin called Saya about the opportunity and wanted Saya to invest and become a partner.

23.     All of the forgoing information, including, but not limited to, the Sadruddins' own admissions set forth in paragraphs 21(a) and 21(b), provides probable cause to believe that the Sadruddins submitted fraudulent and misleading documents, including, but not limited to, a grant application, a letter on ARTI letterhead, and an ARTI financial statement to ECD in order to secure and obtain a $3 million grant for TCA; and $950,000 of the fraudulently obtained grant proceeds were then utilized to repay the lender, "C.A.C", who had provided TCA with the funds to purchase the real property at 90 Ferro Street, Pikeville, Tennessee, more fully described in

paragraph 6 above.

**Conclusion**

24.     Based upon all the foregoing information, probable cause exists to believe that

Karim and Rahim Sadruddin have committed violations of federal law including conspiracy to

commit wire fraud and money laundering.  Furthermore, I have probable cause to believe the

defendant property constitutes proceeds traceable to violations of 18 U.S.C. § 1343 (Wire

Fraud), and 18 U.S.C. § 1957 (Money Laundering) and is subject to civil forfeiture pursuant to

18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) and constitutes proceeds traceable to violations of

18 U.S.C. § 371 (Conspiracy to Commit an Offense or to Defraud United States) and is subject

to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) by 18 U.S.C. § 1956(7)(F).

FURTHER THIS AFFIANT SAYETH NOT.

David Kukura, Special Agent
Federal Bureau of Investigation

STATE OF TENNESSEE

COUNTY OF _Hamilton_

On this _5th_ day of June _2019_, before me, personally appeared David Kukura,

in his capacity as a Special Agent with the Federal Bureau of Investigation, to be known to be

the person described in and who executed the foregoing instrument, and acknowledged that he

executed the same as his free act and deed.

IN WITNESS WHEREOF I have hereunto set my hand and Notarial Seal.

Subscribed to and sworn before me on this this _5th_ day of June, 2019.

_Terrie L. Scharer_
NOTARY PUBLIC

My Commission Expires: _11-26-2022_

TERRIE L. SCHARER
STATE
OF
TENNESSEE
NOTARY
PUBLIC
MARION COUNTY